AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Central District of Illinois

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 19-MJ- 6084
)
THE BUSINESS, E-MOTION PRODUCTS, LOCATED )
AT 124 WEST LOCUST STREET, FAIRBURY, IL 61739 )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Central_____ District of _____Illinois_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 7413(c)(2)(C) | criminal violations of the Clean Air Act |

The application is based on these facts:
See attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.*

s/William Oros
_____
Applicant's signature

William Oros, Special Agent, EPA- Crim. Investigation Div.
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone & email
*(specify reliable electronic means).*

s/Jonathan E. Hawley
_____
Judge's signature

Date: 08/21/2019

City and state: Peoria, Illinois

Jonathan E. Hawley, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, William Oros, Special Agent with the Charlotte Resident Office of the United States Environmental Protection Agency, Criminal Investigation Division, being duly sworn and deposed, state as follows:

## BACKGROUND/INTRODUCTION

1. I am a Special Agent with the United States Environmental Protection Agency ("EPA"), Criminal Investigation Division ("CID"). I have been so employed since approximately August 2008. As part of my EPA-CID training, I attended the Federal Law Enforcement Training Center in Glynco, Georgia and completed the twelve-week Basic Criminal Investigator Training Program. I have also completed the nine-week EPA-CID Environmental Investigator Basic Training Program. I have received training in investigating violations of the federal environmental and Title 18 laws and have investigated numerous pollution-related offenses and permit violations. I have a Bachelor of Science degree with a concentration in biology and a minor in chemistry. From February 1998 until August 2008, I was employed as an Environmental Analyst by the State of Connecticut Department of Environmental Protection ("CT DEP"). As an Environmental Analyst, I received training with respect to, and participated in, the investigation of violations of environmental laws and regulations. I have attended numerous training courses on techniques for investigating environmental crimes and participated in the execution of multiple federal search warrants.

2. As part of my duties as an EPA-CID Special Agent, I investigate criminal violations of environmental laws, including the Clean Air Act, 42 U.S.C. § 7413(c)(2)(C), as well as violations of Title 18 of the United States Code. I am duly authorized by Title 18, United States Code, Section 3063, to carry firearms, to execute and serve any warrant or other process issued

1

under the authority of the United States, and to make arrests without warrants for any offense committed in my presence or for any felony offense that I have probable cause to believe the person to be arrested has committed or is committing.

3.      This Affidavit is made in support of an application for a warrant to search the E-Motion Products 124 W. Locus Street, Fairbury, IL, as further described in Attachment A (hereinafter, "Subject Premises"), for evidence and instrumentalities of criminal violations of the Clean Air Act, 42 U.S.C. § 7413(c)(2)(C), as further described in Attachment B.

4.      The statements made in this Affidavit are based on my personal knowledge; my training, education and experience; information that I have received from regulatory personnel, information contained in financial records and open source public records. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence and instrumentalities of criminal violations of the Clean Air Act, 42 U.S.C. § 7413(c)(2)(C).

5.      The purpose of the Clean Air Act ("CAA") is, among other things, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). In enacting the CAA, Congress found that "the increasing use of motor vehicles . . . has resulted in mounting dangers to the public health and welfare." 42 U.S.C. § 7401(a)(2).  Thus, the CAA regulates "mobile sources," which include motor vehicle engines and off-road vehicles and engines and sets emission standards.

6.      The EPA regulates emissions standards and, pursuant to 42 U.S.C. § 7521(m)(1), requires vehicle manufacturers to install on-board diagnostic (OBD) systems, which monitor all

emissions-related engine systems and components. *See* 40 C.F.R. §§ 86.010-18 and 86.1806-05. Those systems and components include the diesel oxidation catalyst ("DOC"), the selective catalytic reduction ("SCR") system, the diesel particulate filter ("DPF"), and the exhaust gas recirculation ("EGR") system. Section 203(a)(3)(A) of the CAA, 42 U.S.C. § 7522(a)(3)(A), prohibits removal of or rendering inoperable certain elements of design or devices which are installed in compliance with regulations. Section 203(a)(3)(B) prohibits the manufacture, selling or offering to sell, or installation of any part or component where the principal effect of the part or component is to bypass, defeat, or render inoperative any element of design where the person knows or should know that such part or component is being offered for sale or installed for such use. These parts or components are commonly referred to as "defeat devices." If any of the emissions hardware components (DOC, DPF, SCR, or EGR) are removed or disabled, a properly functioning OBD will detect a malfunction. Thus, a defeat device must be used to manipulate the OBD to prevent the truck from going into "limp mode" and to prevent the Malfunction Indicator Light from turning on. The practice of using a defeat device to manipulate an OBD system in this manner is commonly referred to as "tuning" the vehicle. When a vehicle is "tuned," it can run with normal (and even increased) horsepower and torque, and at normal speeds without the hardware emission components installed on the engine. This results in significantly increased pollutant emissions released by the diesel truck into the atmosphere. Although it is possible for an individual to legitimately "tune" in a manner that does not impair emission controls or the OBD, using other methods, this Affidavit focuses on those circumstances where tuning manipulates a vehicle's OBD system in such a way as to prevent the OBD from detecting the removal or disabling of the emission hardware components. When a vehicle is "tuned" in this way, it may be able to run with increased horsepower and torque, and a vehicle's fuel mileage may also

increase. However, tuning vehicles in this manner results in significantly increased pollutant emissions. The process of tuning uses specialized software called a "tune," which affects pre-existing engine software and can alter engine operations, including emissions controls and monitoring devices. The EPA is aware of multiple types of defeat devices used for tuning. One example is a plug-in tuner, which is a defeat device that can be plugged into the vehicle's data link connector to the OBD and permit "on-the-fly" tuning. Plug-in tuners allow the driver to turn on and off at will the software modifications that manipulate the engine computer module and prevent the OBD from detecting a malfunction in the emission controls.

7. In addition to various civil enforcement mechanisms, the CAA provides criminal penalties for tampering with monitoring devices or methods. Pursuant to 42 U.S.C. § 7413(c)(2)(C), any person who knowingly falsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be maintained or followed under the CAA shall, upon conviction, be subject to a fine and up to two years of imprisonment. 42 U.S.C. § 7413 (c)(2)(C).

8. Other criminal statutes are used to enforce the CAA. In pertinent part, 18 U.S.C. § 1001 prohibits anyone in any matter within any jurisdiction of the executive, legislative, or judicial branch of the government from knowingly and willfully making a material false, fictitious, or fraudulent statement or representation; or falsifying, concealing, or covering up by any trick or scheme, or device, a material fact.

9. Additionally, if two or more persons either conspire to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more such persons do any act to effect the object of the conspiracy, each conspirator may be imprisoned for not more than five years and fined pursuant to 18 U.S.C. § 371.

## ELECTRONIC DEVICES

10. Based on my training and experience, participation in environmental crimes investigations and financial investigations, which result from violations of environmental protection laws, I know:

    a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Subjects commonly use cellular telephones to communicate with other members of their organization, and with customers.  Cellular telephones have the capability of storing numerous telephone numbers of other individuals. Cellular telephones also can have "Caller ID" and "Text Messaging" features on the telephones.  "Caller ID" identifies the telephone numbers of the incoming calls.  Text messages can be stored on the cellular telephone and also identifies whom the message was sent to or whom it came from.  In addition, cellular telephones have the capability of recalling past telephones numbers dialed.

    c. The data stored on cellular telephones is generally easy to delete.  In fact, many phones have the ability to have their memory completely deleted remotely, such as via the Internet.

    d. Electronic devices, including some cell phones, are devices capable of storing various types of data, including downloaded music, video, voice memos, photographs, and emails from computer or Wi-Fi connection.  The fact that certain electronic devices can hold or contain email, text, or other similar data content is significant due to the fact that such devices can store text data that includes, but is not limited to, records of transactions and contact information for co-conspirators.

    e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include

  various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

  f. Tablet and Laptop: A tablet and laptop is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

  g. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons: Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

11. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of electronic devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-

assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## FACTS IN SUPPORT OF PROBABLE CAUSE

*Summary*

12. I have reviewed information which EPA-CID received from the EPA Air Enforcement Division regarding the alleged sale of aftermarket vehicle emissions defeat devices by Spartan Diesel Technologies ("Spartan" hereinafter) and Patriot Diagnostics ("Patriot" hereinafter), including records and the acquisition by EPA of vehicle emissions defeat devices marketed and sold by Spartan/Patriot obtained through the course of the investigation. Matthew Geouge (Geouge) owned and operated both Spartan and Patriot located in Flat Rock, North Carolina and Hendersonville, North Carolina. Geouge purchased vehicle emission defeat devices from E-Motion Products, 124 West Locus Street, Fairbury, Illinois. Geouge offered for sale, and sold, vehicle emissions defeat devices purchased from E-Motion under the Spartan Diesel Technologies, and subsequently the Patriot Diagnostics, labels to customers via the internet through the Spartan/Patriot website and through other on-line vehicle aftermarket parts vendors. E-Motion's website identifies five other venders, in addition to Spartan, that sell their vehicle emissions defeat devices as well as offering marketing and technical support services.

*Details of the Investigation*

13. On October 30, 2018, I received information from the United States Environmental Protection Agency that an administrative law judge issued an Initial Decision and Order on Default in the matter of Spartan Diesel Technologies, LLC ("Respondent"). Spartan was ordered to pay a civil penalty in the amount of $4,154,805 for violating section 203(a)(3)(B) of the CAA, 42 U.S.C. § 7522(a)(3)(B). The order states in summary that:

a) Respondent manufactured, sold, offered to sell, or installed (or caused the foregoing with respect to) at least 5,000 Spartan Phalanx Flash Consoles ("Subject Components"), each of which disables, defeats, or renders inoperative devices or emissions related elements of design installed in Ford diesel trucks for compliance with Title II of the CAA. The Subject Components were designed for Ford Diesel truck models F250, F350, F450, and F550 for model years 2008 through 2012. The Complaint states that the manufacture, sale, offering for sale or installation of, or causing the foregoing with respect to, each such Subject Component constitutes one or more separate violations of section 203(a)(3)(A) or (B) of the CAA, 42 U.S.C. § 7522(a)(3)(A) or (B).

b) From January 2011 through at least April 2013, Respondent manufactured, sold, offered to sell, or installed (or caused the manufacture, selling, offering to sell, or installation of Spartan Phalanx Flash Console Tuners ("Subject Components").

c) Each Subject Component was designed and marketed for use with, or to become part of, a specific make, model and year (or range of years) of Ford trucks powered by heavy duty diesel engines ("HDDEs"). There are two models of the Subject Components: the Spartan 5 Phalanx Flash Console 6.4L Tuner designed for model years 2008 through 2010 Ford Diesel F250, F350, F450, and F550 trucks, and the Spartan Phalanx Flash Console 6.7L Tuner designed for model years 2011 and 2012 Ford Diesel F250, F350, F450, and F550 trucks.

d) Each Subject Component disables, defeats, or renders inoperative devices or elements of design installed on or in Ford's motor vehicles or motor vehicle engines for compliance with Title II of the CAA, including but not limited to elements of design related to the following:

(a) Ford-specified torque management parameters;
(b) Engine fueling parameters;
(c) Engine fueling timing;
(d) Turbocharger boost controls and other parameters;
(e) Transmission shift scheduling;
(f) Transmission shift pressures;
(g) Transmission torque converter lockup parameters;
(h) EGR;
(i) OBD monitoring function for the EGR, thereby also allowing the physical removal of the EGR from the vehicle;
(j) DPF regeneration functionality; and
(k) OBD monitoring function for the DPF, thereby also allowing the physical removal of the DPF.

e) In December 2013, an inspection team comprised of staff from EPA and from Eastern Research Group, Inc. ("ERG") under a contract with EPA conducted an investigation of Respondent for selling potential defeat devices for on-highway heavy-duty diesel engines. The investigation included performing emissions testing of a Spartan Phalanx Flash Console 6.7L Tuner installed on a 2011 Ford F-350 truck, a test vehicle provided by Ford, at a Ford testing facility. ERG installed the Spartan Phalanx Flash Console 6.7L Tuner and, together with EPA and Ford, performed the testing. EPA testing confirmed the device defeated the vehicle emissions system.

14. Based on the documentation and photographs, the Spartan "Phalanx vehicle tuner" has the following patent numbers on a sticker affixed to the back of the unit:

> 7,786,851
> 7,928,837
> 8,339,524

These patent numbers and unit design of the Phalanx vehicle tuner are the same used on the Patriot Diagnostic Systems "nDash vehicle tuner." The patent states in part that:

> The direct connection between the display module and the data link facilitates bi-directional communication with the vehicle's on-board computer(s) for diagnostics as well as reprogramming of the on-board computer(s) which may be accomplished in real-time.

15. The nDash tuner sold by Patriot Diagnostics System is warranted by E-Motion Products. E-Motion Products is registered with the Illinois Secretary of State located at 124 W. Locust St, Fairbury, IL 61739; Agent: John A. Slagel, 308 E. Mirlynbeth LN, Fairbury, IL. E-Motion's website states in part:

> E-Motion is an engineering group that develops products and tools for (original equipment manufacturers), aftermarket companies, and automotive enthusiasts.
>
> Our specialty is designing and building products that connect to vehicles through the OBD2 (on-board diagnostics) port. We are experts at decoding and understanding protocols and ECU (engine control unit) communications. We have experience reprogramming and reverse engineering ECUs and vehicle networks.

> We do not sell direct to consumers, but we have several distributors. Some even develop ECU Calibrations and offer our products with ECU reprogramming capabilities.
>
> E-Motion's staff is comprised of software and hardware engineers that share a passion for the unique combination of high-tech products and performance cars.
>
> All of our products are sold through other companies or dealers, mostly in private label arrangements. Customers approach us with a specification for their product and we can work with them to engineer their solution and provide them with a low cost and capable platform.
>
> We also talk to individuals and Sole Proprietors that have expertise in vehicle calibration but need our assistance launching their product or networking them with another one of our customers that may be able to help them market the product thru a retail channel.

E-Motion's website also identifies the nDash and nGauge tuners as their products and identifies Spartan Diesel Technologies as one of six entities vehicle owner can purchase E-Motion tuners from. The nDash and nGauge tuners are advertised on E-Motion's website as "Can be turned into a reprogramming device by our distributors that offer tuning."

16. From February 2013 to July 2014, Spartan Diesel Technologies paid E-Motion products $2,701,822. The EPA found that Spartan Diesel Technologies had manufactured, sold, offered to sell, or installed (or caused the foregoing with respect to) vehicle emisiones defeat devises, each of which disables, defeats, or renders inoperative devices or emissions related elements of design installed in Ford diesel trucks for compliance with Title II of the CAA.

17. After market vehicle parts blogs dated January 24, 2017, state that Spartan Diesel Technologies was acquired by Patriot Diagnostics. On February 28, 2018, the North Carolina Secretary of State issued an administrative dissolution certificate to Spartan Diesel Technologies.

18. Spartan/Patriot no longer has an internet, support, direct marketing, and sales presence following the Initial Decision and Order on Default, however, their defeat devices are still available for sale through various on-line aftermarket vehicle parts vendors. Devices sold by

E-Motion Products are currently available and being marked as aftermarket vehicle tuning devices though the companies Zeitronix, Lund Racing, DP-Tuner, and Dream Science.

19. On January 22, 2019, EPA CID purchased a Patriot Diagnostics System n-Dash tuner. Instructions accompanying the unit identify E-Motion Products as warranting the nDash for a period of one year.

20. On March 22, 2019, EPA CID conducted surveillance of E-Motion Products 124 West Locus Street, Fairbury, Illinois. The Agent observed E-Motion Products name identified on the glass door of the store front and took photographs of the inside of the business through the window. There were two persons working in the business, a computer, filing cabinets, desks, files, and a warehouse area with shelves and boxes on them.

21. On August 2, 2019, EPA-CID, again conducted surveillance of E-Motion Products 124 W. Locus Street, Fairbury, IL. The Agent observed E-Motion Products in the same state he had observed on March 22, 2019, the business was active, at least one person was working inside the business, and there was a computer, filing cabinets, desks, files, and a warehouse area with shelves and boxes on them.

22. Based on my experience and training vehicle emissions defeat devices such as the ones sold by E-Motion Products that removes or modifies legal vehicle emissions devices use sophisticated software, computer equipment and requires engineering. Additionally, product sales assistance, marketing, trouble shooting, etc., is frequently accomplished using cellular, telephonic, and electronic communication as well as the use of the internet. Therefore, the warrant sought is intended to apply to any electronic devices found at the E-Motion Products business location, 124 West Locust Street, Fairbury, Illinois 61739, to include computers and tablets, as well as any cellular telephones belonging to the business.

23. To preserve the investigation and prevent the destruction of evidence it is requested that the warrant and associated documents remain sealed.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. As described above and in Attachment B, this Affidavit seeks permission to search for records that might be found on the business premises of E-Motion Products in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

25. *Probable cause.* I submit that if a computer or storage medium is found on the business premises of E-Motion Products, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

    b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide

13

       crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

   c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

   e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

      27. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution.* Because this warrant seeks only permission to examine device already in law enforcement's possession, the execution of this warrant does not involve the

15

physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

30.  I request that the search warrant be issued for electronic devices for a full search, to include, but not limited to a full forensic examination, from the electronic devices seized in this case is likely to provide incriminating evidence against E-Motion Products.

## CONCLUSION

Based upon training, experience, and the facts of this investigation, I submit that there is probable cause to believe that Items to be Seized, listed in Attachment B, will be found inside of the "Property to be Searched," described in Attachment A (including the land, building, and any outbuildings or vehicles), and that it will yield evidence listed in Attachment B relevant to the alleged violations of CAA as well as violations of Title 18 of the United States Code; therefore, I request that the Court issue a warrant for the same.

s/William Oros

AFFIANT, SPECIAL AGENT, WILLIAM OROS
UNITED STATE ENVIRONMENTAL PROTECTION AGENCY
CRIMINAL INVESTIGATION DIVISION

Sworn and subscribed to me telephonically pursuant to Fed. R. Crim. P. 41(d)(3) and Rule 4.1 this 21st day of August, 2019 at _9:02 am_ (Central Standard Time).

s/Jonathan E. Hawley

JONATHAN E. HAWLEY
UNITED STATES MAGISTRATE JUDGE

16

## ATTACHMENT A
### Property to be Searched

E-Motion Products, 124 West Locust Street, Fairbury, Illinois 61739

E-Motion Products occupies a store front at 124 West Locust Street, Fairbury, Illinois, on the first floor of a two-story building. The business store front (in the second picture below) is painted a cream color with a glass door. The second story is constructed of red brick with a shed roof running the length of the building between the first and second floors. E-Motion and the business address is written on the door. There black mail box on the right side of the door and a maroon color bench also to the right of the door. The first photo below is an image looking inside from the front of the business.



## ATTACHMENT B
### Items to be Seized

This Affidavit is made in support of this Application to seize the following items:

1. Documents related to E-Motion Products business (including but not limited to books, records, papers, notes, licenses, licensing agreement, patents, product inventory records, product purchase records and agreements, vendor records, manuals, certificates, calendars, correspondences and communications, corporate structure records, ownership and partnership records, ledgers, receipts, shipping and receiving documents, billing records, directory, notes, schedules, addresses, telephone records, photographs, video, payroll records, time cards, tax documents, property ownership records, bank records, employee records, contract employee records, consultant records, engineering records, work orders, invoices, contracts, bids, customer support records, product warranty records, marketing records, sales records, regulatory records, consulting records, sales and marketing records, programming files, tuning files, update files, customer files, dealer files, private label arrangements, policy ).

2. Media that can contain documents or recordings related to E-Motion Products business (including but not limited to cameras, tablets, phones, computers, external storage devices, or other electronic devices).

3. Electronically stored data, to include all records on the cameras, tablets, phones, computers, external storage devices and other electronic devices seized, that relate to violations of the Clean Air Act, 42 U.S.C. § 7413(c)(2)(C); conspiracy, 18 U.S.C. § 371; and the prohibition on False Official Statements, 18 U.S.C. § 1001.  As used above, the term "records" includes all evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.